UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

DARRYN CLARK,

                              Plaintiff,                                    15-CV-08406 (PKC)(SN)

        -against-                                                          <u>REPORT AND</u>
                                                                           <u>RECOMMENDATION</u>
COMMISIONER OF SOCIAL SECURITY,

                              Defendant.

-----------------------------------------------------------------X
SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE P. KEVIN CASTEL:

        Plaintiff Darryn Clark brings this action pursuant to Sections 205(g) and 1631(c)(3) of

the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3). He seeks judicial review of

the final determination of the Commissioner of Social Security (the "Commissioner") denying

his application for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties

both moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.

        I find that the ALJ failed to consider the substantial evidence in support of the treating

sources' opinions, did not develop the record fully, and inappropriately analyzed Clark's

credibility. I, therefore, recommend that Clark's motion for judgment on the pleadings be

GRANTED, the Commissioner's motion for judgment on the pleadings be DENIED, and the

case be remanded to the Commissioner for proper analysis of Clark's credibility and for further

development of the record.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 12/19/2016 __

# BACKGROUND

## I.     Evidence in the Administrative Record

On October 3, 2012, Clark filed for DIB benefits, alleging an onset date of his disability of September 29, 2012. The parties agree that his date of last insured is December 31, 2013. The Social Security Administration ("SSA") denied his application, and Clark requested a hearing before an administrative law judge ("ALJ"). On April 14, 2014, Clark and his attorney appeared before ALJ Mark Solomon. On June 24, 2014, the ALJ issued a decision denying Clark's application and finding him not disabled within the meaning of the Act during the period relevant to his claim. The Commissioner's decision was rendered final when the Appeals Council denied Clark's request for review of the ALJ's decision on September 17, 2015.

### A.  Clark's Testimony at the ALJ Hearing

Clark testified that he lived with his wife, and, though he was physically capable of dressing, feeding, clothing, and bathing himself, his wife often forced him to complete those tasks. He did not use public transportation unless he had an appointment, and then he would travel with his wife or a friend. He would not travel alone because he would experience panic attacks. Clark testified that he used to get panic attacks every other week, with each attack lasting between two to five minutes, but that he had not had one in the three weeks leading up to the ALJ hearing. Clark spent most of his time watching television. He slept only 1.5 hours each day, with half-hour naps, a problem he had had for years.

Clark is currently on 100 percent disability from the U.S. Department of Veteran Affairs ("VA"). Two years after joining the military, he was discharged under honorable conditions because of his personality disorder. Clark was last employed in 2012 as a substance abuse counselor for veterans at Samaritan Village. He stated that he was unable to do the work and that

he would alternate between performing well and going into a slump. Clark was previously employed as a: (1) substance abuse counselor at Narco Freedom; (2) warehouse supervisor at Closets by Design; (3) scheduler at Ultimate Distribution; and (4) warehouse worker at Recall.

In terms of treatment, Clark said he was seeing a counselor, Leanne Coupe, every other week, and that he was taking five medications at the time. He testified that the medications did not work very well.

### B. Medical History

#### 1. Leanne Coupe, Licensed Clinical Social Worker and Therapist

Ms. Coupe first began seeing Clark in December 2009. Her treatment notes from May 2012, indicate that Clark's mood was depressed. For example, Clark reported on May 15, 2012, that he had been feeling "extremely depressed" for a two-week period and "feeling hopeless," expressing, "I don't want to be here anymore." Administrative Record ("AR") 245. Clark also told Ms. Coupe he had difficulty getting out of bed and was frequently tearful and crying. Clark accepted Ms. Coupe's offer of scheduling an assessment for inpatient stay. Similarly, on May 22, 2012, Ms. Coupe listed Clark's mood as "depressed," and reflected that Clark's downswings in mood often corresponded to lapses in medication. AR 243. During that same session, Clark admitted he had a history of inconsistently using medication.

From the end of May to July 2012, Clark reported improvements in mood and a heightened interest in activities, although he "hesitated to state that he [was] feeling 'good,'" and Ms. Coupe continued to describe Clark's mood in her notes as "depressed." AR 242–43. Clark raised a concern that periods of increased energy and mood swings could indicate bipolar disorder and mentioned that he had experienced such periods before. AR 231.

Beginning in mid-September 2012, Clark consistently reported feelings of depression and suicidal ideation. Clark was taking Abilify regularly but had not yet noticed any changes in his mood. In a September 18, 2012 session, he described "feeling hopeless about the possibility of feeling less depressed." AR 229. He mentioned that, though he was taking Abilify[1], he had not noticed any changes in his mood, and that he had increased his Klonopin[2] dosage on his own. Id. On September 26, 2012, Ms. Coupe and Clark worked to identify warning signs of suicide, such as "disappointment," "financial pressures," and "thinking about bipolar [disorder]." AR 225. Clark specified that watching television and talking to his wife were potential ways of distracting himself from thoughts of suicide, as well as making his home environment safe by giving any medicine to his wife to lock up. During the meeting, Clark reported persisting feelings of depression and hopelessness, stating, "sometimes I think I don't want to be here." Id. He wondered if the feelings of depression were related to starting Abilify. In addition, Clark described "fleeting thoughts of jumping in front of a car or bus" and feeling afraid to go outside as a result, but denied taking steps to hurt himself. Id.

Ms. Coupe and Clark created a safety plan and reviewed protocols for contacting a crisis hotline or a local emergency department if he felt he was at risk of hurting himself or others. Clark reported to Ms. Coupe on September 28, 2012, that he was still feeling "depressed and irritable" and was not able to stay at work the day before. AR 221. He told Ms. Coupe that he discussed pursuing inpatient treatment with Dr. Jonathan Kane, his treating psychiatrist. He was also carrying the safety plan created on September 26, 2012, in his pocket.

---

[1] Aripiprazole, sold under the brand name Abilify, is an antipsychotic used primarily in the treatment of schizophrenia and bipolar disorder. It is also used in the treatment of major depressive disorder.
[2] Clonazepam, sold under the brand name Klonopin, is used to treat panic disorder.

According to Ms. Coupe's October 2, 2012 Integrated Summary, Clark's symptoms of depression, including "depressed mood, passive [suicide ideation] (no intents or plans), anhedonia[3], anergy[4], reduced appetite, reduced sleep," had persisted. AR 222. Clark was also experiencing periodic panic attacks, which impeded his ability to work or leave the house. Clark reported that he had been fired from his job recently. He had been feeling "too depressed to work," with fluctuations from over-productivity to under-productivity. AR 219. Such fluctuations had been "a problem for him in the workplace." Id.

In addition, on October 2, 2012, Clark asked Ms. Coupe to write a letter for disability. Ms. Coupe and his treating psychiatrist Dr. Kane wrote that Clark was unable to work because he was "struggling with major depression." AR 220. They concluded that his major depression and psychiatric condition "had responded poorly to multiple medication regimes," and that it was likely to "permanently and totally impact his ability to do any kind of work for the foreseeable future." Id.

Clark continued to report depressive symptoms throughout October and November 2012, after the date of alleged onset for his disability. For example, records from October 9, 2012, note "significant depressive [symptoms]," AR 218, and records from November 13 and 20, note that he was "mildly depressed" and "depressed," respectively, AR 208, 206. According to Ms. Coupe's November 20, 2012 treatment notes, Clark spent his time indoors, either in bed or watching TV. He had brief "occasional 'spurts' of energy." AR 208, 206. During those spurts of energy, Clark would start a project but not necessarily finish, such as emptying the cabinet, then

---

[3] Anhedonia is the inability to experience pleasure from usually enjoyable activities, such as exercise, hobbies, music, sexual activities or social interactions.
[4] Anergy is the lack of energy.

going out for a soda, and returning without any energy or motivation to finish. During his

November 27, 2012 session, Clark again reported ongoing depression and isolation.

Ms. Coupe's notes reflect that her next session with Clark was scheduled for December 4,

2012. The record reflects that this session occurred, AR 175, but Ms. Coupe's notes are not

included in the administrative record. Indeed, the administrative record does not contain any

further notes, records or other information from Ms. Coupe for the period of January 2013 to

May 1, 2014. See AR 175–93. Certain records show that Clark's medical records were printed on

December 6, 2012, suggesting that additional records that cover the relevant period are likely

available. (Other Progress Notes appear to have been printed on April 18, 2014, though these

reflect only Dr. Kane's medication management notes. See AR 270–96.)

The record evidence suggests, however, that Clark continued to see Ms. Coupe for

therapy sessions. On May 1, 2014, Ms. Coupe submitted a letter to the Department of Veterans

Affairs in which she reported that she had been treating Clark "for weekly psychotherapy

sessions to address his depression and anxiety with panic attacks since December 2009." AR

298. She reported that Clark "struggles with debilitating bouts of depression that greatly interfere

with his day-to-day functioning." Id. "In addition to depressive symptoms, including depressed

mood, anhedonia, fatigue, social isolation, irritability, and passive suicidal ideation, he has begun

to experience panic attacks and increased anxiety." Id. She concluded that Clark had not

experienced "any meaningful improvement in his condition" and was "not able to work as a

result." Id.

In addition, notes authored by other doctors confirm that Clark continued to meet with

Ms. Coupe throughout 2013. Dr. Kane reported that, on January 18, 2013, Clark had an

unscheduled appointment with Ms. Coupe on "medication renewal." AR 294. In March 2013,

Dr. Marion Eakin (who was covering for Dr. Kane) indicated Clark was referred to her by Ms. Coupe because he had run out of medication a few weeks ago. Clark informed Dr. Eakin that he was "comfortable sharing concerns with Ms. Coupe." AR 291.

Finally, at his May 2, 2014 hearing before the ALJ, Clark testified that he saw her every week throughout 2013. There is no indication that the ALJ made any effort to secure Ms. Coupe's records.

### 2. Jonathan Kane, M.D., Psychiatrist

Dr. Kane started seeing Clark in 2009. He reports that Clark had always been responsible with taking his medication. Dr. Kane's treatment notes primarily focus on Clark's medication regimen and the results of each visit's physical examination. From June 12, 2012, to November 20, 2012, Dr. Kane assigned Global Assessment Functioning ("GAF") scores[5] of 55 to Clark on an approximately biweekly basis. Dr. Kane assessed GAF scores of 60 from April 26, 2011 to June 5, 2012.

During June and July 2012, the same period in which Ms. Coupe reported a significant improvement to Clark's mood, Dr. Kane noted that Clark experienced significant improvement with increased Celexa and marked improvement with increased Ritalin.

As noted above, Dr. Kane co-signed a letter with Ms. Coupe on October 2, 2012, that reported that Clark was "struggling with major depression, which has severely impeded his

---

[5] "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. rev. 2000) ("DSM-IV")). A GAF between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV 30-32. A GAF between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or social functioning (e.g., few friends, conflicts with peers or co-workers." Id. at 32. The Fifth Edition of the DSM has discarded the use of GAF Scores. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM-V").

ability to work," and that his psychiatric condition was "likely to permanently and totally impact his ability to do any kind of work for the foreseeable future." AR 220. Dr. Kane signed a substantively identical letter on May 1, 2014. AR 297.

Although Dr. Kane noted that Clark was "mildly depressed" from late November 2012 to early January 2013 (AR 220–21, 294, 295), Dr. Kane began to regularly report Clark as "depressed" beginning in late January 2013 to March 2014 (AR 270, 272, 273, 275, 276, 278, 281, 293). During an appointment in February 2013, Dr. Kane noted that Clark had not received a weekly dosage of Klonopin, and was feeling "anxious, somewhat ill." AR 293. In his treatment notes for that same visit, Dr. Kane mentioned that Clark's mood was "anxious, depressed." Id. On March 22, 2013, Clark told Dr. Kane that he was "very depressed," he had been "thinking of suicide earlier this week," and he "wanted to go into the hospital." AR 290. Dr. Kane advised him to go to the Brooklyn VA Hospital's Psychiatric Emergency Room to be evaluated for admission. Dr. Kane's examination that day reported an anxious and depressed mood. Dr. Kane diagnosed Clark with major depressive disorder ("MDD") and post-traumatic stress disorder ("PTSD"), and assessed a GAF score of 55. At the next appointment on April 2, 2013, Clark requested a letter to "document permanent and total disability." AR 289.

Beginning in the early spring of 2013, Dr. Kane's notes document frequent appointments, both scheduled and unscheduled, with Clark regarding medication management. AR 272–73, 276, 278, 296. Although Dr. Kane marked Clark's mood as "mildly depressed" in the earlier visits regarding medication management, Clark's mood was almost always noted as "depressed" from the September 2013 visits onwards. In both the October 2, 2012 and May 1, 2014 letters, Dr. Kane opined that Clark's disorder had "responded poorly to multiple medication regimes." AR 297.

### C.  Consultative Physicians and Other Non-Treating Physicians

#### 1.  Angela Fairweather, Ph.D., Consultative Psychiatrist

On January 29, 2013, at the request of the Commissioner, psychologist Dr. Angela Fairweather examined Clark. Dr. Fairweather diagnosed Clark with bipolar disorder and panic disorder. Clark reported difficulty falling asleep, appetite loss, daily dysphoric mood, loss of interest, and feelings of worthlessness. He stated he had intermittent suicidal ideation, with the last time being four to five weeks ago, but no current suicidal thoughts and no history of suicide attempts. According to Dr. Fairweather's report, Clark also reported having panic attacks two to three times a week and a history of manic episodes consisting of "increased energy, racing thoughts, and destructive behavior." AR 258–59.

Dr. Fairweather noted that Clark was able to dress, bathe, and groom himself, as well as do light food preparation, light shopping, and take public transportation. But, according to Dr. Fairweather, Clark denied having friends and reported being withdrawn from family members, spending his days watching television. Dr. Fairweather also opined that Clark exhibited (1) "mild to moderate difficulty" making appropriate decisions; (2) "moderate difficulty" performing complex tasks independently and relating adequately with others; and (3) "moderate to significant difficulty" maintaining a regular schedule and appropriately dealing with stress. AR 260. It was her belief that Clark's psychiatric conditions caused "moderate to significant impairment in the claimant's ability to function on a daily basis." AR 260. She believed that Clark would need assistance to manage funds "due to poor decision making." AR 261.

Dr. Fairweather recommended that Clark continue with his current psychiatric treatment. She rendered a "[g]uarded" prognosis, "given the claimant's poor responsiveness to treatment."

Id. At the time of the consultation with Dr. Fairweather, Clark was taking citalopram[6],

methylphenidate[7], Abilify, and Klonopin.

### 2. Jerome Caiati, M.D.

On January 29, 2013, the same day as Dr. Fairweather's consultative psychiatric

evaluation, Dr. Jerome Caiati examined Clark for a consultative internal medicine examination.

Clark stated that he showered, bathed, and dressed himself, and that he enjoyed watching

television. He noted that his wife did the household chores and shopping. Dr. Caiati diagnosed

Clark with history of bipolar disorder and substance abuse. In terms of prognosis, Dr. Caiati

stated that Clark would benefit from psychiatric or psychologic evaluation. Regarding physical

limitations, Dr. Caiati opined that Clark's "[s]itting, standing, walking, reaching, pushing,

pulling and climbing are unrestricted," and that "[b]ending and lifting" had a "minimal limitation

due to low back pain." AR 264.

### 3. Wlodek Skranovski, M.D.

Dr. Wlodek Skranovski, a psychiatric consultant from the Disability Determination

Service, completed a Disability Determination and Transmittal form for Clark on February 22,

2013. Dr. Skranovski opined that, based on his review of Clark's medical records and self-report,

Clark was not disabled. He was able to perform activities of daily living, including shopping and

using public transportation. Dr. Skranovski also noted that Dr. Fairweather's statements about

Clark's poor social skills and capacity to deal with stress were "not supported by examination /

any objective data." AR 52.

---

[6] Citalopram is an antidepressant drug used to treat major depressive disorder, anxiety, panic disorder, and dysthymia.
[7] Methylphenidate is an amphetamine used to treat attention deficit hyperactivity disorder.

### 4.   Other Non-Treating Physicians

The record contains opinions and examination results from non-treating physicians who covered for Dr. Kane. Clark visited VA psychiatrist Dr. Page Burkholder for medication refills on a day when Dr. Kane's clinic pharmacy was temporarily unavailable. During his visit with Dr. Burkholder, Clark denied any side effects from his medication. He became moderately irritable when he realized he would have to wait at the pharmacy. Clark reported sleeping and eating well.

On March 12, 2013, Clark presented to Dr. Marion Eakin, stating that he had run out of medication two weeks ago and was feeling "edgy." AR 291. He noted that, though he felt that he could share his feelings with his wife and Ms. Coupe, he generally kept to himself and avoided people. In addition, Clark denied any active intent or plans to harm himself, but reported passive suicidal ideation at the time. Dr. Eakin assessed a GAF score of approximately 50, and recorded Clark's plan to discuss his sleep problems with Dr. Kane after he resumed his medications.

On May 24, 2013, Clark had an appointment with Dr. Victoria Cressman, who was on call for Dr. Kane that day. Clark noted "ongoing dysthymia[8]," which Dr. Cressman's examination confirmed. AR 285. Clark reported that he wished to continue his current medication regimen, which he found helpful. He complained of insomnia and noted he had stopped taking Ambien because he had started to sleep better. Dr. Cressman determined that Clark had transitioned to current chronic dysthymia, which was an improvement from his previous depressive state. She repeated the diagnoses of MDD and PTSD, and assessed a GAF score of 55.

---

[8] Dysthymia is a mood disorder consisting of the same cognitive and physical problems as in depression, with less severe but longer-lasting symptoms.

### 5.  Disability Determination by the VA

The VA determined that, effective April 4, 2013, Clark was 100% disabled as a result of recurrent MDD. The VA had previously determined that Clark was 70% disabled.

### D.  Opinions of the Vocational Expert, Melissa Fass Karlin

At the May 2, 2014 administrative hearing, the ALJ presented vocational expert Melissa Fass Karlin with a hypothetical claimant with the following characteristics: Clark's age, education, and previous work experience, who could remember, understand, and carry out simple instructions, maintain attention and concentration for rote work; who could maintain a regular schedule and can perform at low stress job (defined as one with only simple decision making and no close interpersonal contact with the general public). Ms. Karlin opined that Clark would not be able to do any of his past personal work.

The ALJ then asked Ms. Karlin to identify any jobs that this hypothetical claimant would be capable of performing, assuming that the claimant was limited to occasional (meaning up to one-third of the workday) close interpersonal contact with supervisors and coworkers. Ms. Karlin stated that the claimant would be capable of working jobs as a hand packager, a cleaner or a kitchen helper, but not as a warehouse worker, which would require more contact with coworkers.

The ALJ next presented Ms. Karlin with a series of scenarios in which the hypothetical claimant's characteristics had been slightly altered. If the claimant had no useful ability to interact with others, Ms. Karlin stated that he would not be able to find any employment. If the claimant was unable to maintain attention and concentration for rote work, he would likewise not be able to sustain competitive employment. If the claimant was unable to maintain a regular schedule or was off-task for more than ten percent of the time, Ms. Karlin likewise testified that

there were no jobs the claimant could do. Specifically, if the claimant was expected to miss more than one day a month from work, he would not be able to find any competitive employment.

## DISCUSSION

**I.     Standard of Review**

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995) (*per curiam*). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or if it is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, then those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). See also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). Therefore, if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v.

Comm'r of Soc. Sec'y, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*" (citation and quotation marks omitted; emphasis in original)). "Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, 'we must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) ("Cruz I")). "The Act must be liberally applied, for it is a remedial statute intended to include not exclude." Cruz I, 912 F.2d at 11.

Though generally entitled to deference, an ALJ's disability determination must be reversed or remanded if it is not supported by "substantial evidence" or contains legal error. See Rosa, 168 F.3d at 77. Thus, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, No. 10-CV-4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted). Without doing so, the ALJ deprives the court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

## II.    Definition of Disability

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A determinable physical or mental impairment is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A claimant is deemed disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).[9]

Pursuant to the Act, the SSA has established a five-step sequential evaluation process that the ALJ must follow in order when rendering disability determinations. See 20 C.F.R. § 416.920. If the ALJ determines that the claimant is not disabled at one step of the evaluation process, the evaluation will not proceed to the next step. The Court of Appeals for the Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It

---

[9] The statutory definition of "disability" in an SSI case under 42 U.S.C. § 1382c is "virtually identical" to the standard applied to disability insurance benefits cases under 42 U.S.C. § 423. Hankerson v. Harris, 636 F.2d 893, 895 n.2 (2d Cir. 1980). Because the same standard of review applies, courts cite to cases under 42 U.S.C. § 1382c and 42 U.S.C. § 423 "interchangeably." Id.

is only after the claimant proves that he cannot return to his previous work that the burden shifts

to the Commissioner to show, at step five, that other work exists in the national and local

economies that the claimant can perform, given his residual functional capacity ("RFC"), age,

education, and past relevant work experience. 20 C.F.R. § 416.960(c)(2); Melville, 198 F.3d at

51.

The Code of Federal Regulations provides additional guidance for evaluating mental

impairments at step two of the analysis, which focuses on determining how the impairment

"interferes with [the claimant's] ability to function independently, appropriately, effectively, and

on a sustained basis." 20 C.F.R. § 416.920a(c)(2). The main areas assessed are: activities of daily

living; social functioning; concentration, persistence or pace; and episodes of decompensation.

20 C.F.R. § 416.920a(c)(3). The degree of limitation in the first three functional areas are rated

on a five-point scale: none, mild, moderate, marked and extreme. 20 C.F.R. § 416.920a(c)(4).

The last area, episodes of decompensation, is rated on a four-point scale: none, one, two, three

and four or more. Id.

A mental disorder qualifies as a "listed impairment" if it is "[c]haracterized by a

disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood

refers to a prolonged emotion that colors the whole psychic life; it generally involves either

depression or elation." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. To reach the requisite

severity requirement, the individual must (A) show signs of depressive, manic or bipolar

syndrome, and either (B) experience "marked restriction" in two of the following: (i) activities of

daily living; (ii) maintaining social functioning; (iii) maintaining concentration, persistence, or

pace; or (iv) repeated episodes of decompensation (the so-called "B Criteria"); or (C) have a

"[m]edically documented history of chronic affective disorder of a least two years' duration that

has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" and one of the following: (i) repeated episodes of decompensation, each of an extended duration; (ii) [a] residual disease process that has resulted in such a marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate; (iii) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement (the so-called "C Criteria"). Id.

### III.    The ALJ's Determination

In his June 24, 2014 decision, the ALJ concluded that Clark had not been under a disability as defined in the Act from September 29, 2012 to December 31, 2013, and denied his DIB application. Although the ALJ determined that Clark had severe impairments of MDD and PTSD, he stated that Clark retained the RFC to perform a full range of work subject to the following nonexertional limitations: Clark could "remember, understand and carry out only simple instructions and maintain attention and concentration for only rote work. He can maintain a regular schedule and perform a low stress job, defined as one with only simple decision-making and with only occasional close interpersonal contact with supervisors and coworkers, and no close interpersonal contact with the general public." AR 15. Based on this finding, the ALJ concluded that there were representative occupations, such as hand packager, cleaner, and kitchen helper, that Clark could perform.

**IV.     Statement of Law**

    **A.  The Treating Physician Rule**

Under the "treating physician rule," an ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must provide "good reasons" for the lack of weight attributed to the treating physician's opinion. Halloran, 362 F.3d at 32. In determining how much weight to assign, the ALJ must consider factors including the length, nature, and extent of the treatment relationship, the extent to which the treating physician's opinion can be supported by the record, and the physician's area of specialization. 20 C.F.R. § 404.927(c)(2). It is not necessary, however, for the ALJ to robotically "recite each factor"—it is sufficient that "the decision reflects application of the substance of the [treating physician] rule." Martinez-Paulino v. Astrue, No. 11-CV-5485 (RPP), 2012 WL 3564140, at *16 (S.D.N.Y. Aug. 20, 2010) (citing Halloran, 362 F.3d at 32)); see also Camille v. Colvin, 104 F. Supp. 3d 329, 341 (W.D.N.Y. 2015).

In addition, although opinions from medical sources, such as licensed social workers and therapists, are not considered "acceptable medical sources," they are nevertheless "important and should be considered on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *3 (Aug. 9, 2006). Consideration of an opinion from a health provider who is not an "acceptable medical source" may be particularly important where that person is the "sole source that had a regular treatment relationship with plaintiff." White v. Comm'r of Social Sec., 302 F. Supp. 2d 170, 176 (W.D.N.Y. 2004).

### B.  The Duty to Develop the Record

The treating physician rule is "inextricably linked" to the ALJ's affirmative duty to develop the record. Jackson v. Colvin, No. 13-CV-5655 (AJN)(SN), 2014 U.S. Dist. LEXIS 124378, at *41 (S.D.N.Y. June 11, 2014). Due to the "non-adversarial nature" of Social Security proceedings, a full hearing requires the ALJ to "affirmatively develop the record" to reflect the claimant's medical history for at least a twelve-month period. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d); Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982); Martello v. Astrue, No. 12-CV-215S (WMS), 2013 WL 1337311, at *3 (W.D.N.Y. Mar. 29, 2013).

The duty to develop the administrative record includes the specific obligation to seek clarifying information from treating sources. If a physician's report appears to contain inconsistencies or errors, the ALJ must "affirmatively seek out clarifying information from the doctor" before discrediting the opinion. Duncan v. Astrue, No. 09-CV-4462 (KAM), 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011). When the ALJ fails to develop the record adequately, the district court must remand to the Commissioner for further development. See, e.g., Rosa, 168 F.3d at 79–80 (determining that ALJ committed legal error by failing to request supplemental information from treating physicians to explain gaps in the record); Malarkey v. Astrue, No. 08-CV-9049 (JCF), 2009 WL 3398718, at *12–13 (S.D.N.Y. Oct. 20, 2009) (remanding case where ALJ did not attempt to obtain clarification from treating physician regarding perceived inconsistencies in the treating notes); Kercado ex rel. J.T. v. Astrue, No. 08-CV-478 (GWG), 2008 WL 5093381, at *1 (S.D.N.Y. Dec. 3, 2008) (citing cases).

**V.     Analysis of the ALJ's Decision**

The ALJ's reasoning suffers from several legal errors that justify remand. First, the ALJ's decision ignored substantial evidence in the contemporaneous treatment records that supported Dr. Kane's and Ms. Coupe's opinions. Second, the ALJ did not satisfy his affirmative duty to develop the record by failing to gather Ms. Coupe's records for 2013, and not seeking clarification where he found inconsistencies in Clark's treatment records. Third, the ALJ appeared to rely on only a small portion of Clark's testimony at the hearing in rendering an adverse credibility determination without applying the additional factors.

**A.  Substantial Evidence**

The ALJ did not accord controlling weight to Dr. Kane's and Ms. Coupe's opinions because he found them "contrary to the actual treatment notes which indicate that the claimant's condition . . . has improved since the alleged onset date." AR 18. The ALJ stated that "in fact the treatment notes refer to his depression as mild." Id. The records do not support this conclusion. Although Dr. Kane reported Clark's mood as "mildly depressed" at various points in his examination summaries, he often reported Clark's mood as "depressed." See, e.g., AR 293 (reporting mood was "anxious, depressed" on February 5, 2013); AR 290 (reporting mood was "anxious, depressed" on March 22, 2013); AR 281; AR 278; AR 276; AR 274. In fact, Dr. Kane regularly reported Clark's mood as "depressed" from September 6, 2013 to December 2013, several months after the alleged onset date.

As discussed earlier, Ms. Coupe's treatment notes are incomplete and cover only the first two months following the alleged onset. Shortly before his alleged date of onset, Clark had told Ms. Coupe that he was "feeling hopeless about the possibility of feeling less depressed." AR 229. Throughout October and November 2012, Clark reported continuing depression and

isolation. Notes from Ms. Coupe's October 2, 2012 session with Clark showed that he was feeling "too depressed to work" and had been recently fired from his job. AR 219. Thus, those records that are available in the record, do not support a finding of improved mental health.

The ALJ also refused to assign controlling weight to Clark's treating physicians' opinion that he "responded poorly to multiple medication regimens." The ALJ found that this conclusion was inconsistent with their notes showing that Clark's condition was "in fact well-controlled with medication." AR 18. But the ALJ failed to consider other evidence in the record supporting Ms. Coupe's and Dr. Kane's determination. In September 2012, around the same time he began to report depressive symptoms after experiencing improvement over the summer, Clark started taking Abilify for his depression regularly, but reported no changes to his mood. At the September 26, 2012 session with Ms. Coupe, Clark stated he was feeling more depressed and wondered if it could be related to starting Abilify. Clark had previously taken Sertraline and Mirtazapine for depression. Moreover, Dr. Kane's treatment notes indicate that he periodically changed or increased Clark's medication and dosage. Before May 2012, Clark was taking Ritalin at "5 mg po tid" (5 milligrams by mouth, three times a day). AR 239. On May 22, 2012, Dr. Kane increased Clark's Ritalin dosage to "10 mg po tid" (10 milligrams by mouth, three times a day). AR 243. Dr. Kane also increased Clark's Celexa dosage to "40 mg po hs" (40 milligrams by mouth, at bedtime). Id. Then, in September 2012, Dr. Kane increased Clark's Klonopin dosage to "2 mg PO bid" (2 milligrams by mouth, twice a day) and Abilify dosage to "20 mg PO qd" (20 milligrams by mouth, every day). AR 227. Clark had also informed Ms. Coupe that he "increased his Klonopin dose on his own." AR 229. Ms. Coupe encouraged Clark to discuss any changes to his medication with Dr. Kane. In February 2013, Clark reported feeling "very anxious, somewhat ill" after he had not received the expected Klonopin dosage. AR 293. Dr.

Kane told Clark that he would "represcribe whatever is allowed." Id. In fact, starting in the early spring of 2013, many of Clark's appointments with Dr. Kane, both scheduled and unscheduled, were focused on "medication management." AR 272–73, 276, 278, 296.

The ALJ also pointed to the fact that Dr. Kane and Ms. Coupe had not documented any "suicidal or homicidal ideation" as support for the proposition that Clark's condition was "well-controlled" and had improved. The ALJ did not consider that, while both Dr. Kane and Ms. Coupe had not documented any *active* suicidal ideation, the record contains several references to Clark's *passive* suicidal ideation. In May 2012, Clark presented to Ms. Coupe with depressive symptoms that had lasted two weeks, stating, "I don't want to be here anymore." AR 245. Ms. Coupe offered to help schedule an assessment for inpatient stay, which Clark accepted (there is no indication in the record, however, that Clark actually received inpatient treatment). Then, in September 2012, Ms. Coupe and Clark worked on identifying potential warning signs of suicide, which included "disappointment" and "thinking about bipolar DO." AR 225. Ms. Coupe also assisted Clark with thinking of ways to distract himself from thoughts of suicide, including talking to his wife and watching television, and ways to ensure a safe environment, such as giving any medication to his wife to lock away.

A few days later, Clark reported to Ms. Coupe that he sometimes thought "I don't want to be here." Id. Clark said he felt afraid to go outside because he was having "fleeting thoughts of jumping in front of a car or bus." Id. At the same meeting, Ms. Coupe and Clark devised a safety plan, one that he carried around in his pocket. At almost every appointment, Ms. Coupe went over safety protocols with Clark, including the phone numbers for a crisis hotline and a local emergency department if he felt he was about to harm himself or others. Furthermore, Ms. Coupe stressed repeatedly that she was available for support during the times between appointments. In

October 2012, non-treating physician Dr. Dana Clutter documented in an "R3 Continuity Clinic Note" that, although Clark denied any current suicidal ideation, he suggested that any plan would involve an "overdose." AR 212. Clark affirmed he would "present to ED [emergency department]" if he developed suicidal ideation. Id. Clark also complained to Dr. Kane in March 2013 that he had been "thinking of suicide earlier this week" and had "wanted to go into the hospital." AR 293. Dr. Kane advised Clark to seek an evaluation from the Brooklyn VA Hospital's Psychiatric Emergency Room for admission. Accordingly, the record contains specific occasions in which Clark expressed passive suicidal ideation and his treating physicians recommended taking affirmative steps (including creating a safety plan, recommending admission at a Psychiatric Emergency Room, and obtaining an assessment for inpatient treatment).

The ALJ additionally noted the fact that Clark's "GAF scores have been indicative of only moderate symptoms" in his determination to not give controlling weight to Dr. Kane's and Ms. Coupe's opinions. AR 18. But a patient's GAF score is meant to serve only "as a global reference intended to aid in treatment" and "does not itself necessarily reveal a particular type of limitation and is not an assessment of a claimant's ability to work." Beck v. Colvin, No. 13-CV-6014 (MAT), 2014 WL 1837611, at *10 (W.D.N.Y. May 8, 2014) (internal quotation marks omitted). Moreover, these scores were assigned by Dr. Kane alone, who was responsible for Clark's medication but not apparently engaged in any counselling or therapy.

The ALJ also asserted that Clark's "panic attacks are infrequent and of short duration." AR 18. The record contains several references to the frequency of Clark's panic attacks, but makes little mention of the duration of those attacks. A Compensation and Pension Exam conducted by the Brooklyn VA Medical Center on March 18, 2011, indicates that Clark reported

experiencing panic attacks every three weeks, and taking Clonazepam every day for the prior

two weeks to reduce panic symptoms. Ms. Coupe noted, in September 2012, that Clark

experienced "periodic" panic attacks that impeded his ability to work or leave the house. AR

222. Dr. Fairweather's report also indicates that Clark reported experiencing panic attacks

approximately two to three times a week (though Dr. Fairweather's report was accorded only

partial weight by the ALJ). The ALJ should not impose his own opinion that weekly or biweekly

panic attacks count as "infrequent," given that none of Clark's treatment providers reached any

conclusions with respect to the frequency of the attacks. The ALJ moreover appeared to have

drawn his opinion that the attacks were of short duration solely from Clark's testimony at the

hearing that his panic attacks generally lasted "two minutes, maybe five minutes." AR 33. The

ALJ's conclusion that a 2-5 minute panic attack is "of short duration" is a medical conclusion not

supported by any evidence in the record.

      Because the ALJ failed to consider this evidence, I recommend a remand. Should this

case be returned to the Administration, upon a further development of the record, the ALJ should

identify with specificity the weight assigned to Ms. Coupe's and Dr. Kane's opinions.

**B. Gaps and Inconsistencies in Plaintiff's Medical History**

   **1. Missing Records of Appointments with Ms. Coupe**

      Even if the Court agreed with the ALJ's assessment that Ms. Coupe's and Dr. Kane's

conclusions were inconsistent with the treating notes, the ALJ "did not have the luxury of

terminating his inquiry" at that stage in the analysis. Morillo v. Apfel, 150 F. Supp. 2d 540, 546

(S.D.N.Y. 2001). Instead, each time the ALJ perceived an inconsistency or gap, he had an

affirmative duty to "seek clarification and additional information . . . to fill any clear gaps before

dismissing the doctor's opinion." Calzada v. Astrue, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010).

Here, the ALJ did not satisfy his "threshold duty to adequately develop the record before deciding the appropriate weight to afford to a treating physician's opinion." Nusraty v. Colvin, No. 15-CV-2018 (MKB), 2016 WL 5477588, at *12 (E.D.N.Y. Sept. 29, 2016). The record does not include any documentation from Ms. Coupe, a frequent and longstanding treating source, for the critical period from January 2013 (three months after his alleged onset date) to December 2013, which comprises the bulk of Clark's disability period, despite his testimony that he continued to see Ms. Coupe every week throughout 2013.

Moreover, there is no indication that the ALJ attempted to develop the record with respect to Ms. Coupe and obtain the relevant treatment notes for the rest of the disability period before according Ms. Coupe less than controlling weight. Accordingly, this failure to obtain the necessary records justifies remand, given the possibility that Clark shared information about his mental condition with Ms. Coupe that he may not have shared with anyone else. See AR 291 (Clark stated he felt "comfortable sharing concerns with Ms. Coup"). Remand is all the more appropriate based on the ALJ's explanation that he discounted Ms. Coupe's opinions because they were inconsistent with contemporaneous treatment records, which the Court now finds to be incomplete. See Downes v. Colvin, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *10 (S.D.N.Y. July 22, 2015) ("Importantly, however, to the extent that the record is unclear, the Commissioner has an affirmative duty to fill any clear gaps in the administrative record before rejecting a treating physician's diagnosis." (citation and internal quotation marks omitted)).

### 2.  Inconsistency in Clark's Medication Management

In addition, the record contains a major inconsistency with respect to Clark's medication management. Dr. Kane stated that, since he began "following" Clark in 2009, Clark had always been "responsible" with his medication. AR 293. In a May 2012 session with Ms. Coupe,

however, Clark admitted to a history of inconsistent use of medication, and that the longest time

he had been "consistent on his meds [was] a couple of months." AR 243. Ms. Coupe noted that

changes in Clark's mood, such as increasing depression, were historically tied to lapses in taking

medication. During that same appointment, Clark promised Ms. Coupe that he would try to take

medication consistently for at least six months. The record also contains two instances in which

Clark changed his medication type or dosage on his own initiative. First, Clark stopped taking

Ambien in 2010 because "he was sleeping well," and his medical records from that year "do not

indicate that it was stopped for concerning reasons." AR 285. Second, he informed Ms. Coupe

on September 18, 2012, that he increased his Klonopin dosage "on his own." AR 229. Later that

same day, Clark met with Dr. Kane, in which Dr. Kane noted that the Klonopin dosage would be

increased to 2 milligrams, twice a day.

There is no evidence, however, that the ALJ attempted to contact Dr. Kane or Ms. Coupe

to clarify this inconsistency in Clark's medication management before reaching his conclusion

that Clark's psychiatric condition was "in fact well-controlled with medication." AR 18. See,

e.g., Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) (remanding because the

ALJ appeared to violate his duty to develop the record by failing to seek clarifying information

from the treating physician to explain inconsistencies in two reports); Jones v. Colvin, No. 14-

CV-556S (WMS), 2015 WL 5126151, at *3 (W.D.N.Y. Sept. 1, 2015) (holding that if the record

is inadequate, "the ALJ will first contact the claimant's treating source to obtain the information,

or if the information is not readily available from the treating source, the ALJ may ask the

claimant to attend a consultative examination at the Social Security Administration's expense");

Cruz v. Astrue, No. 12-CV-953 (GWG), 2013 WL 1749364, at *10 (S.D.N.Y. Apr. 24, 2013)

(noting that after the ALJ found inconsistencies in the record, he fulfilled his duty to develop the

record by contacting the treating physician twice, even though the physician responded with insufficient information).

Accordingly, the ALJ committed legal error by failing to contact Clark's treating sources to clarify the aforementioned gaps and inconsistency in the record, as was his duty. The case should therefore be remanded for further development of the record.

### C. Credibility Determination

It is the ALJ's role to evaluate a claimant's credibility and to decide whether to discredit a claimant's subjective estimate of the degree of her impairment. Tejada v. Apfel, 167 F.3d 770, 775–76 (2d Cir. 1999). See also 20 C.F.R. § 416.929(b) (holding that an individual's subjective complaints alone do not constitute conclusive evidence of a disability). The Commissioner has established a two-step process to evaluate a claimant's testimony regarding his symptoms. Murphy v. Barnhart, No. 00-CV-9621 (JSR)(FM), 2003 WL 470572, at *10 (S.D.N.Y. Jan. 21, 2003). First, the ALJ must consider whether the claimant has a medically determinable impairment that is reasonably expected to produce the symptoms alleged by the claimant. Sarchese v. Barnhart, No. 01-CV-2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002) (citing SSR 96–7p, 1996 WL 374186, at *1 (July 2, 1996)); 20 C.F.R. §§ 404.1529(b), 416.929(b). Second, if the ALJ determines that the claimant is impaired, he then must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms—if the claimant's statements about his symptoms are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility. Sarchese, 2002 WL 1732802, at *7; SSR 96–7p, 1996 WL 374186, at *1 (July 2, 1996).

In assessing the claimant's credibility, the ALJ must consider "all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony." Alcantara

v. Astrue, 667 F. Supp. 2d 262, 277–78 (S.D.N.Y. 2009). In addition to objective medical evidence, the ALJ must consider the claimant's daily activities; the location, nature, extent, and duration of her symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken, and other treatment undertaken to relieve symptoms. SSR 96–7p, 1996 WL 374186, at *3 (Jul. 2, 1996) (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)); see also Sarchese, 2002 WL 1732802, at *7 (listing factors).

Here, the ALJ determined that Clark's testimony concerning the intensity, persistence, and limiting effects of his symptoms was "not entirely credible" and "not supported by the evidence of record." AR 18. In discussing the severity of Clark's symptoms, the ALJ concluded that the treatment records reflect mental health within "normal limits." But as discussed above, the ALJ did not have critical record from January-December 2013 to substantiate this conclusion. The ALJ further noted that Clark "has not been hospitalized" and has experienced "no hallucinations or paranoia." But neither the Act nor the Commissioner's regulations or policy rulings "require a claimant to obtain certain psychiatric treatment in order to be found disabled due to [his] mental impairment." Harris v. Colvin, 149 F. Supp. 3d 435, 449–50 (W.D.N.Y. 2016).

Finally, the ALJ was fixated on one portion of the approximately 30-minute hearing in finding Clark to be not credible. Clark testified that he slept for just one-and-a-half hours each day, with naps throughout the day. AR 36–37. The ALJ described this testimony as "totally devoid of credibility as there is absolutely no credible evidence of effects of substantial sleep deprivation which would manifest itself if the claimant was only able to sleep 1 ½ hours per day for the period of time he alleged." AR 18. The ALJ noted that the testimony was especially incredible given that Clark had no sleep problems until he stopped taking Ambien and "his most

recent treatment notes make no mention of substantial sleep deprivation or insomnia." Id. But the record contains at least two references, dated several months after Clark's alleged date of onset, to his struggle with insomnia. An appointment with Dr. Eakin in March 12, 2013, showed a notation for "poor sleep." AR 291. Dr. Cressman's notes for a May 24, 2013, visit also indicated that Clark reported "ongoing insomnia." AR 285. Even accepting, *arguendo*, that if one portion of Clark's testimony was not supported by objective evidence of "effects of substantial sleep deprivation," the ALJ still discounted Clark's overall testimony as "not entirely credible," without considering the additional factors required by 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), or specifying what statements, aside from the testimony regarding the sleeping problems, contributed to the adverse credibility determination.

## CONCLUSION

For these reasons, I find that the ALJ failed to consider the substantial evidence in support of the treating sources' opinions, did not develop the record fully, and analyzed Clark's credibility improperly. Accordingly, I recommend that the Commissioner's motion for judgment on the pleadings be DENIED, and the plaintiff's cross-motion for judgment on the pleadings be GRANTED. I recommend that the case be REMANDED for proper analysis in line with this decision.

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      New York, New York
            December 16, 2016

29

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ .P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2) (C), (D), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable P. Kevin Castel at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Castel. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).